## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

PRINCE-RENE AZUMAH,

       *Plaintiff*,

  v.

JANET YELLEN, Secretary of the United
States Department of the Treasury,

       *Defendant*.

Civil Action No. 1:20-cv-02696 (CJN)

### MEMORANDUM OPINION

Prince-Rene Azumah worked as an IT Specialist at the Treasury Department from March 2017 until his termination in December 2017. *See generally* Compl., ECF No. 1; Def.'s Mem. in Supp. of Mot. to Dismiss or alternatively for Summ. J. ("Def's Mot."), ECF No. 7-1. He claims that Treasury both discriminated and retaliated against him in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* Treasury has moved to dismiss the claim of unlawful retaliation and for summary judgment on the claim of unlawful discrimination. *See* Def's Mot. The Court grants the Motion for reasons that follow.

### I.      Background

Azumah joined Treasury as a federal contractor in October 2015. Compl. at 1. He worked on Treasury's Data Act Project, which was led by Sharanjit Singh, a Treasury employee who worked closely with Azumah. *Id.*; Affidavit of Sharanjit Singh ("Singh Aff."), ECF No. 7-2, Ex. A at 2. James Graham, the Director of Data Management for the Office of the Chief Information Officer, also worked with Azumah during this period. *See* Affidavit of James Graham ("Graham Aff."), ECF No. 7-3, Ex. B at 2.

1

A probationary position to work as a Treasury IT specialist opened up in January 2017. *See* Def's Mot., ECF No. 7-4, Ex. C at 1.  Singh emailed Graham to recommend Azumah.  *Id.* Graham informed Azumah of the vacancy.  *See* Graham Aff. at 3.  Azumah applied.  *Id.*  After Azumah went through an interview process, Graham offered him the job.  *See* Affidavit of Prince-Rene Azumah ("Azumah Aff."), ECF No. 7-6, Ex. E at 1; Graham Aff. at 3.

At Treasury, Azumah worked with a team of other IT specialists in the Enterprise Data Management group under the supervision of Roger Mishoe.  Graham Aff. at 5–6.  While Azumah's position required him to function as part of a team, the parties disagree over the extent to which Azumah did so effectively.  Azumah claims that his work went well until the arrival of Nishana Kuruppu and Siporah Jackson, whom he claims harassed him soon after their arrival.  Compl. at 1.  Azumah also asserts that he reported the harassment to Singh, but that Singh "orchestrated" his termination rather than aid in resolution of the conflict.  *Id.*

Treasury paints a much different picture of what transpired, claiming instead that Azumah conflicted with the team beginning in March 2017.  Def's Mot. at 3.  Graham contends that he began receiving complaints about Azumah's temper and unprofessional communication style in April.  *Id.*  Graham met with Azumah on several occasions to discuss the escalating complaints.  Graham Aff. at 6.  He also conducted an additional meeting after Azumah told Singh that he might quit.  *Id.* at 8.

Then, in July, Azumah engaged in an email exchange with Jackson and Kuruppu that Singh deemed unprofessional.  Singh Aff. at 3.  The unprofessional communication grew worse from that point forward.  In November, Singh emailed Graham, Mishoe, and human resources that despite Azumah's "great work," his "communications problems" "introduce[] a long-term risk to the project team."  Def's Mot., ECF No. 7-13, Ex. L.  Singh later shared with Mishoe a timeline

documenting Azumah's alleged pattern of improper behavior.  Def's Mot., ECF No. 7-16, Ex. O.

A week later, Azumah sent Singh, Graham, and Mishoe an email "to set up a meeting to clear my

name."  Def's Mot., ECF No. 7-17, Ex. P.  The email included a screenshot of one of Azumah's

skype exchanges with Kuruppu.  *Id.*  Part of the exchange shows that Azumah stated to Kuruppa

the following:

> You have limited understanding of the technical process but you think you can
> order me about to do just about anything. Do you know reloading the grant schema
> will destroy all the work with have done yesterday? But you put grant files there.
> This got to stop Nishana. If you feel you know more than me then you can work
> with Fletcher and I will leave the team. I am really not interested in some of the
> approach you want to use.  *Id.*

Graham and Mishoe viewed the message as rude, demeaning, and disrespectful.  Graham Aff. at

9.

Azumah's requested meeting took place with Singh, Graham, and Mishoe all in attendance.

Def's Mot., ECF 7-18, Ex. Q.  Singh, Graham, and Mishoe claim that Azumah handled himself

unprofessionally during the meeting, Graham Aff. at 9; Singh Aff. at 4, and the next day, all three

recommended his termination to human resources in light of Azumah's track record of

unprofessional conduct and communication issues, Def's Mot., ECF No. 7-19, Ex. R.  In early

December, Azumah received a notice informing him that management had decided to terminate

his employment for his "poor communication skills" and his inability to work with team members.

Def's Mot., ECF No. 7-20, Ex. S at 1.

Azumah, represented by counsel, contacted an Equal Employment Opportunity counselor

on January 6, 2018.  Def's Mot., ECF No. 7-21, Ex. T.  His informal complaint identified "Race"

and "Sex" as the bases for the alleged discrimination.  *Id.* at 4.   Azumah did not check the box

denoting "Reprisal."  *Id.*  He then filed a formal complaint on January 26, 2018, which stated that

he believed "the Agency discriminated against him on the bases of *race* and *sex* when, on

December 7, 2017, the Agency terminated Mr. Azumah's employment." Def's Mot., ECF No. 7-22, Ex. U at 2 (emphasis added). Azumah again identified "Race" and "Sex" as the bases for the alleged discrimination. *Id.* at 3. He again did not check the box denoting "Retaliation/Reprisal." *Id.* The Agency's acceptance letter stated that "[t]he following claim is accepted for investigation: Was Complainant, a probationary employee, discriminated against based on his *race* (African-American) and *sex* (male) when on December 7, 2017, the Agency terminated his employment?" Def's Mot., ECF No. 7-23, Ex. V at 1 (emphasis added). It mentioned nothing about a claim for unlawful retaliation. It also advised Azumah (and his attorney at the time) to contact the Agency if either believed "the claims are improperly formulated, incomplete, or incorrect." *Id.* Neither Azumah nor his counsel objected to the formulation.

Azumah initiated this lawsuit on his own behalf on September 9, 2020. Compl. at 2. Azumah alleges that Treasury terminated him based on his race and sex in violation of Title VII. He also alleges that Treasury retaliated against him for the complaints he made "about how [he] was treated" by Kuruppu and Jackson.[1] *See generally id.* Treasury has moved to dismiss Azumah's unlawful retaliation claim for failure to exhaust and has moved for summary judgment on Azumah's unlawful discrimination claim. *See generally* Def's Mot.

## II. Motion to Dismiss

To survive a motion to dismiss under Rule 12(b)(6), a plaintiff must plead "facts to state a claim of relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A court treats the "complaint's factual allegations as true and afford[s] the plaintiff the benefit of all inferences that can be derived from the facts alleged." *Atlas Brew Works, LLC v. Barr*, 391 F.

---

[1] Azumah filed this lawsuit without the aid of counsel. This Court will construe his complaint "liberally" because the law holds *pro se* litigants to a "less stringent standard" compared to "formal pleadings drafted by lawyers." *Gong v. Napolitano*, 612 F. Supp. 2d 58, 61 (D.D.C. 2009) (citing *Erickson v. Pardus*, 551 U.S. 97, 106 (1976)).

Supp. 3d 6, 11 (D.D.C. 2019) (internal quotations and citations omitted). Although the Court accepts all well pleaded facts in the complaint as true, "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. The claim to relief must be "plausible on its face," *id.*, meaning that the plaintiff must have pleaded "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).[2]

### Azumah's Claim of Unlawful Retaliation

Title VII provides that "[i]t shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice." 42 U.S.C. § 2000e–3(a). To state a *prima facie* case of unlawful retaliation under that provision, a plaintiff must show that (1) he engaged in a protected activity, (2) he suffered an adverse employment action, and (3) a causal link connects the two. *Taylor v. Small*, 350 F.3d 1286, 1292 (D.C. Cir. 2003). A critical step precedes a plaintiff's attempt to state a *prima facie* claim of unlawful retaliation: the plaintiff must exhaust administrative remedies before seeking recourse in federal court. *Niskey v. Kelly*, 859 F.3d 1, 3 (D.C. Cir. 2017) (noting that before a "federal employees can bring a [Title VII] claim . . . , they must first present the claim to their employing agency so that the agency can attempt to resolve the matter internally").

A court addresses a motion to dismiss for failure to exhaust Title VII's administrative remedies under Rule 12(b)(6), *see Wheeler v. Becerra*, No. 20-CV-01287 (CRC), 2021 WL

---

[2] "In determining whether a complaint fails to state a claim," courts in the typical case "consider only the facts alleged in the complaint, any documents either attached to or incorporated in the complaint and matters of which [the Court] may take judicial notice." *EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624 (D.C. Cir. 1997). But the D.C. Circuit has instructed district courts to use a more lenient approach when evaluating a motion to dismiss a *pro se* plaintiff's complaint. *See Brown v. Whole Foods Mkt. Grp., Inc.*, 789 F.3d 146, 152 (D.C. Cir. 2015) (noting that "a district court errs in failing to consider *a pro se* litigant's complaint 'in light of' all filings, including filings responsive to a motion to dismiss").

3288079, at *2 (D.D.C. Aug. 2, 2021), as Title VII's exhaustion requirements "are not jurisdictional," *Blue v. Jackson*, 860 F. Supp. 2d 67, 72 (D.D.C. 2012). This non-jurisdictional affirmative defense places on the defendant "the burden of pleading and proving it." *Bowden v. United States*, 106 F.3d 433, 437 (D.C. Cir. 1997) (citation omitted). If the defendant submits materials outside the pleadings to satisfy the burden, the court as a general matter should treat a motion for failure to exhaust as one for summary judgment under Rule 56. *See* Fed. R. Civ. P. 12(d); *see also Kim v. United States*, 632 F.3d 713, 719 (D.C. Cir. 2011) ("District courts may refer to materials outside the pleadings in resolving a 12(b)(6) motion. But when they do, they must also convert the motion to dismiss into one for summary judgment."). In other words, a motion to dismiss for failure to exhaust must be converted into a motion for summary judgment if the defendant relies on something other than "the facts alleged in the complaint, any documents either attached to or incorporated in the complaint, [or] matters of which [a court] may take judicial notice." *EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624 (D.C. Cir. 1997); *Page v. Mancuso*, 999 F. Supp. 2d 269, 275 (D.D.C. 2013) (permitting reliance on "documents upon which the plaintiff's complaint necessarily relies even if the document is produced not by the plaintiff in the complaint but by the defendant in a motion to dismiss"); *Strickland v. Buttigieg*, No. CV 20-1890 (JEB), 2021 WL 3207041, at *1 (D.D.C. July 29, 2021) (observing that a court may take judicial notice of public records, which most of the time will include complaints filed with the EEOC and correspondence between the Agency and the person filing the complaint).

Where, as here, however, the complaint refers to the plaintiff's filings with an Equal Employment Opportunity counselor and the resulting investigation, "the Court will consider the associated documents . . . without converting the motion into one for summary judgment." *Hicklin v. McDonald*, 110 F. Supp. 3d 16, 19 (D.D.C. 2015) (considering plaintiff's EEO complaint and

the resulting investigation because the complaint referenced both); *Saintpreux v. Wolf*, No. 1:19-CV-01364 (CJN), 2020 WL 1814400, at *4 (D.D.C. Apr. 9, 2020).

Azumah, with the aid of counsel, limited the scope of his Title VII lawsuit to race and sex discrimination based on the content of his complaints submitted to the Equal Employment Opportunity counselor.  In his informal complaint, Azumah checked the boxes labeled "sex" and "race" discrimination.  Def's Mot., ECF No. 7-21, Ex. T at 4.  He did not check the box associated with "Reprisal."  *Id.*  Azumah also stated in his informal complaint that:  "I believe that the Agency discriminated against me on the bases of *race* and *sex* when, on December 7, 2017, the Agency terminated my employment."  *Id.* at 17 (emphasis added).  In his formal complaint, Azumah similarly checked the boxes labeled "sex" and "race" discrimination, and again did not check the box associated with "Retaliation/Reprisal."  Def's Mot., ECF No. 7-23, Ex. U at 2.  Azumah also stated that he "believes that the Agency discriminated against him on the bases of *race* and *sex* when, on December 7, 2017, the Agency terminated Mr. Azumah's employment."  *Id.* (emphasis added).  Based on these submissions, the Agency's response letter stated that "[t]he following claim is accepted for investigation:  Was Complainant, a probationary employee, discriminated against based on his race (African-American) and sex (male) when on December 7, 2017, the Agency terminated his employment?"  Def's Mot., ECF No. 7-23, Ex. V at 1.  The letter did not mention an unlawful retaliation claim.  It further advised Azumah and his attorney at the time to contact the Agency if either believed "the claims are improperly formulated, incomplete, or incorrect."  *Id.*  Neither Azumah nor his counsel objected to the formulation.

Azumah argues that failing to check a box on the informal or formal charge should not lead to dismissal for failure to exhaust.  But a number of decisions in this district are to the contrary.  Consider *Deppner v. Spectrum Health Care Res., Inc.*, 325 F. Supp. 3d 176 (D.D.C. 2018).  There,

the court concluded that the plaintiff failed to exhaust her claim of unlawful retaliation because "she checked the boxes for 'race' and 'national origin' while leaving unchecked the box for 'retaliation.'"  *Id.* at 186.  Take, as another example, *Brown v. D.C.*, 251 F. Supp. 2d 152 (D.D.C. 2003).  There, the "plaintiff checked only the boxes for allegations of discrimination based on race and disability, [but] did not check the boxes for gender discrimination or retaliation."  *Id.* at 162. The court held that "plaintiff has failed to exhaust her administrative remedies on her gender discrimination and retaliation claims."  *Id.*  But this case does not involve merely failing to check the appropriate box.  After all, Azumah *twice* explained in writing that he sought relief only for unlawful discrimination on the basis of sex and race, and he did not object to the Agency's description of his claims.

Azumah also argues that he exhausted his unlawful retaliation claim because it relates to his discrimination claim (which he did exhaust).  But the majority of opinions in this district have required exhaustion for all discrete claims, "regardless of any relationship that exists between those discrete claims and any others."  *Rashad v. Wash. Metro. Area Transit. Auth.*, 945 F.Supp.2d 152, 165–66 (D.D.C. 2013); *Hicklin v. McDonald*, 110 F. Supp. 3d 16, 19 (D.D.C. 2015).  That rule facilities efficiency:  Forcing a plaintiff to specify to the administrative agency the charges brought under Title VII "ensure[s] that a charged party has notice of the claim and that narrow issues come before the court for adjudication and decision."  *Maggio v. Wisconsin Ave. Psychiatric Ctr., Inc.*, 987 F. Supp. 2d 38, 42 (D.D.C. 2013), *aff'd*, 795 F.3d 57 (D.C. Cir. 2015).  To be sure, certain courts in this district adhere to a slightly different approach, asking instead whether the challenged claim relates to the allegations in the administrative charge.  *Id.*; *Park v. Howard Univ.*, 71 F.3d 904, 907 (D.C. Cir. 1995) (quotation omitted) ("At a minimum, the Title VII claims must arise from the administrative investigation that can reasonably be expected to follow the charge of

discrimination.")).  But Azumah's claim does not survive under even the more lenient approach, as "[c]laims of 'ideologically distinct categories' of discrimination and retaliation . . . are not 'related' simply because they arise out of the same incident." *Bell v. Donley*, 724 F. Supp. 2d 1, 9 (D.D.C. 2010).

In sum, from the start, Azumah pursued a claim against Treasury for unlawful discrimination on the basis of his race and sex.  He did not mention to the Agency a claim for unlawful retaliation, nor did he (or his attorney at the time) set the record straight when the Agency asked for confirmation.  This claim must be dismissed for failure to exhaust.

### III.     Summary Judgment

A court may grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A "genuine" dispute about a material fact does not exist unless "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  If the moving party has met its burden, the nonmoving party must set forth "specific facts showing that there is a genuine issue for trial" to defeat the motion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).  Though the Court "may not resolve genuine disputes of fact in favor of the party seeking summary judgment," *Tolan v. Cotton*, 572 U.S. 650, 656 (2014) (citation omitted), the nonmoving party must show more than "[t]he mere existence of a scintilla of evidence in support of" its position, *Anderson*, 477 U.S. at 252.  In other words, "there must be evidence on which the jury could reasonably find for [the nonmoving party]." *Id.*

"Credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150–51 (2000) (quoting *Anderson*, 477 U.S. at 255).  Yet "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so

that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

Although "summary judgment must be approached with specific caution in discrimination cases, a plaintiff is not relieved of his obligation to support his allegations by affidavits or other competent evidence showing that there is a genuine issue for trial." *Baylor v. Powell*, 459 F. Supp. 3d 47, 53 (D.D.C. 2020) (quotation omitted). As "conclusory allegations" and "unsubstantiated speculation" will not suffice to create genuine issues of material fact, "[s]ummary judgment for a defendant is most likely when a plaintiff's claim is supported solely by the plaintiff's own self-serving, conclusory statements." *Bell v. E. River Fam. Strengthening Collaborative, Inc.*, 480 F. Supp. 143, 149 (D.D.C. 2020) (quotation omitted).

### Azumah's Claim of Unlawful Discrimination

Section 703(a)(1) of Title VII makes it an "unlawful employment practice" to "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Claims of unlawful discrimination in violation of Title VII "may be proven by direct or circumstantial evidence." *Oviedo v. Washington Metro. Area Transit Auth.*, 948 F.3d 386, 394 (D.C. Cir. 2020). To establish a *prima facie* discrimination claim with indirect evidence, a plaintiff must show that (1) he falls within a protected category, (2) he suffered an adverse employment action, (3) and the unfavorable action gives rise to an inference of discrimination. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 (1993); *Chappell-Johnson v. Powell*, 440 F.3d 484, 488 (D.C. Cir. 2006).

Absent direct evidence, discrimination claims proceed under the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Swierkiewicz v.*

*Sorema N.A.*, 534 U.S. 506, 511 (2002) (clarifying that where a plaintiff produces direct evidence, she "may prevail without proving all the elements of a prima facie case."). Once a plaintiff establishes a *prima facie* case, the burden shifts to the employer to articulate some legitimate, non-discriminatory or non-retaliatory reason on which it relied in taking the complained-of action. *McDonnell Douglas*, 411 U.S. at 802. This burden is "one of production" in which an employer must produce evidence "sufficient for the trier of fact to conclude" that the action was taken for the provided reason. *Mastro v. Potomac Elec. Power Co.*, 447 F.3d 843, 854 (D.C. Cir. 2006); *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 258 (1981) (noting that an employer's explanation for the challenged action must be "clear and reasonably specific"). Some helpful factors used to decide whether the employer has satisfied its burden to articulate a legitimate nondiscriminatory reason for the action taken include: whether (1) the employer produced "evidence that a factfinder may consider [at summary judgment];" (2) "the factfinder, if it believed the evidence, [could reasonably] find that the employer's action was motivated by a nondiscriminatory reason;" (3) the nondiscriminatory reason is "facially credible in light of the proffered evidence;" and (4) the evidence presents "a clear and reasonably specific explanation as to how the employer[ ] applied [its] standards to the employee's particular circumstances." *Figueroa v. Pompeo*, 923 F.3d 1078, 1087 (D.C. Cir. 2019).

When the employer proffers a clear and specific reason, the "central question" at summary judgment becomes whether the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted rationale amounts to a pretext. *Brady v. Off. of Sergeant at Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008) (citing *St. Mary's*, 509 U.S. at 507–08, 511)). Whether evidence proffered to show pretext suffices to raise an inference of unlawful discrimination or retaliation is a fact-sensitive inquiry. *See Aka v. Washington Hosp. Ctr.*, 156 F.3d 1284, 1294

(D.C. Cir. 1998); *Walker v. Johnson*, 798 F.3d 1085, 1091–92 (D.C. Cir. 2015) (identifying the following factors that may support an inference of pretext: the employer's (1) preferential treatment of similarly situated employees outside the plaintiff's protected group; (2) inconsistent or dishonest explanations; (3) deviation from established procedures or criteria; (4) pattern of poor treatment of other employees within the same protected group as the plaintiff; (5) the temporal proximity between an employee's protected activity and the employer's adverse action; and (6) other relevant evidence that a jury could consider to reasonably conclude the employer acted with an illicit motive).

The adverse employment action here is Treasury's termination of Azumah, and Treasury has asserted a legitimate, non-discriminatory reason for doing so.  In particular, Treasury represents that it documented Azumah's dated history of rude behavior toward his colleagues, took notice of the ways in which Azumah's conduct created team conflict, gave him ample opportunity to improve his behavior, met with him to hear out his grievances, and terminated him after he continued to engage in inappropriate and disruptive communication.  The notice of termination memorialized Azumah's track record of poor communication, as it informed him that "you have been verbally counselled for the inappropriate tone of your communication with your co-workers." Def's Mot., ECF No. 7-20, Ex. S at 1.

The decision to terminate an employee based on disruptive and rude behavior is permissible, as an employer may terminate an employee for egregious misconduct, including communicating with colleagues in a way that creates a hostile and disruptive environment. *Weigert v. Georgetown Univ.*, 120 F. Supp. 2d 1, 20 (D.D.C. 2000); *Harris v. D.C. Water & Sewer Auth.*, 791 F.3d 65, 69 (D.C. Cir. 2015) (quotation omitted) (noting that "performance below the employer's legitimate expectations" amounts to one of the most "common (and legitimate) reasons

to terminate an employee").  And the evidence substantiating Azumah's workplace misconduct is consistent with the factors outlined in *Figueroa v. Pompeo*, 923 F.3d 1078 (D.C. Cir. 2019).  First, Treasury has presented sworn declarations and deposition testimony from the relevant decisionmakers—all proffered in an admissible form for trial purposes.  *Id.* at 1087.  Second, the factfinder hearing the evidence would "find that 'the employer's action was motivated by' a nondiscriminatory reason."  *Id.* (quotation omitted).  Third, Treasury's proffered explanation overcomes the "facially credible" hurdle.  *Id.* (quotation omitted).  And fourth, Treasury's explanation falls in the "clear and reasonably specific" bucket.  *Id.* (quotation omitted).

Because Treasury has offered a legitimate, non-discriminatory reason for terminating Azumah, the question at summary judgment is whether Azumah can rebut Treasury's explanation. *See Brady*, 520 F.3d at 494.  Stated differently, the central question is whether Azumah "produced evidence sufficient for a reasonable jury to find that the employer's stated reason was not the actual reason and that the employer intentionally discriminated against [Azumah] based on his race" and sex. *Id.* at 494–95.

Azumah first suggests that Singh orchestrated behind the scenes to find ways to get him fired.  Pl.'s Response to Def.'s Mot. for Summ. J., ECF No. 10, at 2–3.  But that theory, even if accepted as true, does not explain what nefarious motivations were behind Graham and Mishoe's decision to terminate.  Both Graham and Mishoe (together with Singh) made the decision to fire Azumah after conducting a meeting with Azumah and after reviewing his track record of poor communication.  The same problem applies to Azumah's argument that Kuruppu and Jackson had "an agenda" to get him fired.  *Id.*  Even assuming both women had it out for him, that fact alone cannot get around the clear evidence that Azumah communicated in inappropriate ways with his

coworkers (and that Graham and Mishoe based their decision to terminate Azumah on that conduct).

Azumah points to his track record of excellent work, including statements from his supervisors complementing him for his topnotch performance, to suggest that management could have fired him for no other reason than his race or sex.  Compl. at 2.  From all accounts, Azumah put in long hours and generated quality work product in his role as an IT specialist.  Treasury admits as much.  Def.'s Mot. at 21.  But Azumah's conceded acumen does not, without more, demonstrate that Treasury's reason for his termination—that he engaged impolite and disruptive communication with coworkers—was pretextual.

That is particularly relevant where, as here, "the person who made the decision to fire [the plaintiff] was the same person who made the decision to hire."  *Vatel v. Alliance of Auto. Mfrs.*, 627 F.3d 1245, 1247 (D.C. Cir. 2011) (quotation omitted).  In such circumstances, it becomes "difficult to impute to that person an invidious motivation that would be inconsistent with the decision to hire."  *Id.*  This so-called "same actor inference" cuts against inferring discriminatory motives.  *Johnson v. Perez*, 66 F. Supp. 3d 30, 38 (D.D.C. 2014), *aff'd*, No. 15-5034, 2015 WL 5210265 (D.C. Cir. July 1, 2015).  Recall that Singh emailed Graham recommending Azumah as a possible candidate for the probationary position to work as an IT specialist with Treasury when the spot became available in January 2017.  *See* Def's Mot., ECF No. 7-4, Ex. C at 1.  After Azumah went through an interview process, Graham offered him the job.  *See* Azumah Aff. at 1; Graham Aff. at 3.  The same employees who made the decision to hire Azumah also made the decision to fire him, which weakens Azumah's already frail claim that Treasury's reason for his termination was pretextual.

In sum, no reasonable juror could find based on the facts of this case that Treasury's proffered justification for firing Azumah—his conduct toward coworkers—was pretextual. Summary judgment on his employment discrimination claims is therefore appropriate. *Fischbach v. D.C. Dep't of Corr.*, 86 F.3d 1180, 1183 (D.C. Cir. 1996), *as amended on denial of reh'g* (July 15, 1996) ("[T]he issue is not "the correctness or desirability of [the] reasons offered . . . [but] whether the employer honestly believes in the reasons it offers.").

## IV.    Conclusion

Because Azumah failed to exhaust his administrative remedies for his claim of unlawful retaliation, Treasury's Motion to Dismiss that claim is **GRANTED**.  Treasury's Motion for Summary Judgment with respect to Azumah's claim of unlawful discrimination is likewise **GRANTED**.  An Order will be entered contemporaneously with this Memorandum Opinion.


DATE:  August 26, 2021

_____
CARL J. NICHOLS
United States District Judge